

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,379

**BLAINE KEITH MILAM, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. CR09-066
### IN THE 4TH JUDICIAL DISTRICT COURT
### RUSK COUNTY

**COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, PRICE, WOMACK, JOHNSON, KEASLER, and ALCALA, JJ., joined. HERVEY, J., concurred.**

### O P I N I O N

Appellant was indicted in Rusk County for the capital murder of thirteen-month-old Amora Bain Carson, the daughter of his girlfriend, Jesseca Carson.[1] The case was tried in Montgomery County after a change of venue. On May 17, 2010, a jury found him guilty, and, after a separate punishment hearing, the jury answered the future-dangerousness special issue

---

[1] TEX. PENAL CODE § 19.03(a)(8).

"yes," the anti-parties special issue "yes," the mental-retardation special issue "no," and the mitigation special issue "no."[2] The trial judge set appellant's punishment at death.[3] Direct appeal to this Court is automatic.[4] After reviewing appellant's twenty points of error, we find them to be without merit and affirm the conviction and death sentence. We note at the outset that appellant challenges neither the sufficiency of the evidence to support the guilty verdict nor the determination that appellant is not mentally retarded. Because appellant does challenge the sufficiency of the evidence to support the future-dangerousness special issue, we set out, at some length, the facts of the crime and relevant punishment evidence.

## I.

### A.    The State's Guilt-Stage Evidence.

At 10:37 a.m. on December 2, 2008, appellant called 911, and the first thing he said was, "My name is Blaine Milam, and my daughter, I just found her dead." Rusk County Patrol Sergeant Kevin Roy arrived at appellant's trailer home outside Tatum twenty minutes later. Two ambulances were already there. EMTs were standing in the doorway of the master bedroom, where appellant and Jesseca Carson were kneeling on the floor. Sgt. Roy saw "an infant laying on the floor not moving, not breathing, bruised. The baby was laying on its back, and the face of the baby was just one large bruise." He thought that the circular

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) & (b)(2) & (e)(1); *see Gallo v. State*, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007).

[3] TEX.CODE CRIM. PROC. art. 37.071, § 2(g).

[4] Art. 37.071, § 2(h).

bruises he saw on the child's body were caused by a Coke can.  He did not recognize them as human bite marks.

After lead investigator Sergeant Amber Rogers arrived, Sgt. Roy took appellant aside to talk while Sgt. Rogers talked to Jesseca.  Appellant told Sgt. Roy that he and Jesseca had left Amora alone in the trailer and walked up the road to meet a man named Clark who was going to clear some land for him.  They were gone about an hour, and, when they came back, they found "the baby in that condition."  Appellant was calm, collected, and cooperative.  After the interviews, Sgt. Roy read the pair their *Miranda* rights.  He told them that, when the crime-scene investigation was done, they would be taken to the Sheriff's office for more questioning and collection of their clothes.

Shortly thereafter, Kenny Ray, a Texas Ranger, arrived and noticed Jesseca and appellant embracing.  To Ranger Ray, the two looked like "grieving parents," not suspects.  Ranger Ray conducted an hour-long interview with appellant in the front seat of his patrol car.  Appellant told the ranger that authorities were "more than welcome" to search his car and home.  Appellant denied involvement in Amora's death.  He also gave Ranger Ray names of possible suspects and said that whoever did this should "be hung."  In that recorded interview, appellant explained that Jesseca was his fiancee and that Amora was Jesseca's child, but that they both lived with him and he was "raising that baby."

Appellant then told Ranger Ray the same story that he had told Sgt. Roy.  He added that, when he and Jesseca got home, they found Amora, not in her crib, but in a hole in the

floor in the bathroom that he was remodeling.  Appellant said Amora had a blood ring around her mouth, and "it looked like she had been biting the insulation."  She was still breathing, so they called 911.  Appellant later told Ranger Ray that Jesseca called 911 before they found Amora, and that when they found her, she was dead.

Ranger Ray's tone eventually became accusatory.  He told appellant that he knew he was lying, that no one would believe his story, and that everyone would think he had beat the baby because he was the only male in the house. Appellant again denied any involvement in Amora's death  and offered to take a polygraph test.  Finally, Ranger Ray told appellant that he was free to go, meaning that he was free to get out of the patrol car, but not to leave the scene.  By then, Ranger Ray considered appellant a suspect.

The ranger also interviewed Jesseca. At first she "was crying and acting very distraught," but then there was a "pretty drastic" change in her demeanor.  She referred to Amora  as "that baby" and told Ranger Ray an "extremely bizarre story."[5]

The medical examiner gave Amora's cause of death as homicidal violence, due to multiple blunt-force injuries and possible strangulation.  He detailed her injuries: facial abrasions and bruises; twenty-four human bite marks; bruises, scrapes, and abrasions from head to toe; bleeding underneath the scalp; extensive fracturing to the back of the skull; bleeding between the brain and the skull; a laceration to the brain tissue as well as swelling, bleeding, and bruising; bleeding around the optic nerves; bleeding in the eyes and around the

---

[5]  Because Jesseca did not testify at appellant's trial, none of her statements were admitted into evidence.

jugular vein; fractures to the right arm and leg; eighteen rib fractures; a tear to the liver; and extensive injury to the genitals. There were no old injuries suggesting a pattern of abuse.

The investigation quickly poked holes in appellant's story. Shane and Dwight Clark, of Clark Timber, denied any meeting with appellant on December 2nd. Crystal Dopson, manager of the Insta-Cash Pawn Shop in Henderson, said that, shortly after she opened the shop on December 2nd, Jesseca and appellant came in and pawned an electric chain saw and an air impact tool. Surveillance video showed the two in the pawn shop for about fifteen minutes. Surveillance video from the Exxon in Henderson picked them up shortly thereafter. Also, appellant had called his sister, Teresa Shea, that morning before 9:30 a.m., crying and saying that he had "found Amora dead." Teresa told him to call 911, but appellant did not do so until 10:37 a.m.

On December 11th, investigators conducted a second search of appellant's trailer and determined that the south end of the trailer, rather than the master bedroom, was probably the crime scene. They found blood-spatter stains, consistent with blunt force trauma, near the south bedroom. Among the items collected from the south bedroom were: blood-stained bedding and baby clothes; blood-stained baby diapers and wipes; a tube of Astroglide lubricant; and a pair of jeans with blood stains on the lap. DNA testing later showed that Amora's blood was on these items.

On December 13th, appellant's sister, Teresa, went to see appellant in jail. That night, she told her aunt that she "was needing to find a way to get back out to the trailer in Tatum"

because "Blaine had told her that she needed to go out there to the trailer to get some evidence out from underneath of it." The aunt called Sgt. Rogers and told her that "she needed to get out to the trailer immediately, that Teresa was wanting to go out there to get some evidence out from underneath the trailer."

Sgt. Rogers immediately obtained a search warrant, crawled under the trailer, and discovered a pipe wrench inside a clear plastic bag. The pipe wrench had been shoved down "a hole in the floor of the master bathroom." Forensic analysis revealed components of Astroglide on the pipe wrench, the diaper Amora had been wearing, and the diaper and wipes collected from the south bedroom.

Dr. Robert Williams, a forensic odontologist, compared the bite marks found on Amora's body with bite dentition models obtained from appellant, Jesseca, and appellant's brother Danny Milam. Dr. Williams testified that, to "a reasonable degree of dental certainty," appellant's dentition matched eight bite marks on Amora. He could exclude Jesseca from all but one of the bite marks, and he could exclude Danny from all of the bite marks.

Shirley Broyles, the nurse at the Rusk County Jail, testified that appellant called for her one day in January. She found him crying in his cell. He handed her a written request to talk to Sgt. Rogers, and told Ms. Broyles: "I'm going to confess. I did it. But Ms. Shirley, the Blaine you know did not do this. My dad told me to be a man, and I've been reading my Bible. Please tell Jesseca I love her."

**B.     The Defense Guilt-Stage Evidence.**

Appellant's defense focused on Jesseca as the murderer.  The defense called Heather Carson, Jesseca's mother, who said that Jesseca and appellant starting dating around January 2008 and got engaged a few months later.  Jesseca moved in with appellant and his parents that spring.  When Jesseca turned eighteen, she received an insurance settlement from her father's 2001 death.  Heather noticed an immediate change in Jesseca; she became withdrawn and stopped caring about her appearance.  Jesseca started harassing Heather with telephone calls. When Heather learned that Jesseca was making serious and unfounded allegations against her, she stopped talking to her.

Lisa Taylor testified that Jesseca was her daughter's best friend while growing up in Alabama.  Ms. Taylor knew Jessica as "sweet, outgoing, outspoken, funny."  She said that Jesseca, appellant, and Amora visited them in Alabama twice in the fall of 2008.  First,  they came for one night in October. Jesseca was making "bizarre" accusations about her mother. In November, the trio returned to Alabama for about four days and said that they were planning to move there.  Ms. Taylor said that there was a "drastic change" in Jesseca's demeanor.  She was "[w]eird, hollow. . . [l]ike empty."  Looking into her eyes was "like looking into a dark space."  Jesseca was not taking care of Amora and did not give her a bath for the whole week.  She had appellant change Amora's diaper and feed her.   Jesseca seemed in charge, and when she told appellant to do something, he did it.  Ms. Taylor was concerned that there was something profound going on in Jesseca's life and was worried

about her and her baby.

A psychiatrist, Dr. Frank Murphy, testified that he was asked to "offer an opinion in this case of the mental state of Jesseca Carson for the time period beginning sometime around August of 2008 through December 2nd of 2008." Dr. Murphy read interviews with Jesseca and other materials but did not talk to Jesseca. Dr. Murphy said Jesseca's symptoms were consistent with a "psychotic depression . . . . The depression occurs first, and then it gets severe enough that psychosis or loss of touch with reality then occurs . . . . Psychosis means someone has lost touch with reality. The vast majority of times, that means either they're hallucinating or they're delusional."

The defense odontologist, Dr. Isaac, studied five of the bite marks, and could not exclude either appellant or Jesseca.

## C.    The State's Punishment-Stage Evidence.

The State offered evidence that appellant was–at the time of this crime–on probation for solicitation of aggravated sexual assault of a child under the age of fourteen. Appellant had entered the home of an eleven-year-old neighbor, Karah Hodges, and left a stack of pages torn from pornographic magazines, marked with salacious notes, in Karah's dresser drawer. Appellant's probation terms prohibited him from going within "200 feet of a premise where children commonly gather, including school, daycare facility, playground, public or private youth center, public swimming pool, or video facility." Appellant's "mere presence" with Amora was, therefore, a continuing probation violation.

Ranger Ray was recalled to play the entire patrol-car conversation he had recorded with appellant.  Appellant had told Ranger Ray that a third party had forced him to solicit Karah Hodges.  He also discussed several assaults, all of which he described as being of the "he had it coming" variety.

Glenda Risinger, who rented an apartment to appellant and Jesseca in the fall of 2008, testified that when the pair left, the apartment "was trashed. There was stuff left everywhere. The refrigerator was left open with food still in it. . . . It was pretty much just like they just went through and trashed it."  She also found a lightbulb containing methamphetamine and a hunting knife in the toilet tank.

Bryan Perkins, appellant's former boss, testified that appellant had  "control issues" and a "very short" fuse.  Appellant would bring Jesseca to work to keep an eye on her. Mr. Perkins said, "I started talking to him about his controlling problems, you know, that if he kept on controlling his woman, she was going to leave him. And, you know, he just said it seemed like, you know, with that baby, him and Jesseca were not really going to have a life." Mr. Perkins also described a fight appellant had with a customer.

Monty Clark, a Rusk County patrol deputy, testified that, in January 2008, he responded to a fight on the side of the road between appellant and his brother, Danny.  He arrested appellant for assault and family violence.

Kenneth McDade, a fellow  inmate, testified that appellant told him about a plan to escape from the jail and also threatened to stab him with a pencil.

Jesseca's friend, Crystal Zapata, described an incident that occurred after appellant's father died in September but before Amora was killed in December. Ms. Zapata was inside the trailer with Amora, while appellant and Jesseca were arguing outside. Appellant had a gun and threatened suicide; Jesseca was trying to calm him down. Ms. Zapata heard a gunshot. After a few minutes Jesseca came in the door crying and told Ms. Zapata that he had shot into the floorboard of her car when she tried to keep him from leaving. Ms. Zapata characterized appellant as dominant in the relationship.

**D.      The Defense Punishment-Stage Evidence.**

The defense sought to rebut the State's future-dangerousness evidence with both lay and expert witnesses.

Appellant's mother, Shirley Milam, attributed appellant's solicitation of aggravated sexual assault to his mental immaturity. She said he stopped maturing emotionally at age twelve. She testified that appellant had an on-and-off methamphetamine problem and that he had started using drugs again shortly after his father's death. Shirley testified that, after the second time appellant tried to commit suicide to "go be with [his] daddy," she unsuccessfully tried to have him civilly committed. In early November, Jesseca and appellant brought a Ouija board to Shirley's work and told her that they could communicate with their dead fathers.

Appellant's older sister testified that appellant was a polite, passive child and a polite, passive adult. This crime was completely out of character for him. Appellant's childhood

friend said that he did not think appellant was capable of Amora's murder or aggravated sexual assault. He echoed what appellant's family members said about the effect of his father's death: "It affected him really bad, because like him and his dad was real close."

Dr. Patricia Rosen, a medical toxicologist, testified that toxicology reports indicated that appellant had 0.17 milligrams of methamphetamine per liter of blood in his system on December 2nd. Dr. Rosen said this was a "high" dose–ten times the therapeutic dose. Another expert testified about the effects of methamphetamine on the brain and gave her opinion that appellant was a chronic methamphetamine user, whose heavy use could have caused severe psychosis.

Dr. Mark Cunningham, a clinical and forensic psychologist, testified that he was asked to evaluate two issues concerning appellant: 1) "how did we get here?" and 2) "where do we go from here?" Dr. Cunningham interviewed appellant three times, for a total of nearly ten hours. He also interviewed appellant's mother and sisters, and reviewed "a huge volume of records." Dr. Cunningham summarized the answer to the "how did we get here" question:

> There's mental deficiency, youthfulness, meth dependence, meth psychosis, Jesseca's psychosis. Those are all interacting with each other. That's all part of the matrix of his psyche. Now, it's not just those things, of course. There's also the trauma and deprivation, the social deprivation I'm describing, as well as the trauma of his dad's illness, and those experiences. There is the social isolation that came about that robs him of social resources that he might have called upon for some reality testing. There's premature responsibility. There's the death of his father. All of these things are being loaded on and are interacting with each other, as we're coming up to this offense, and the effect of that is this tragedy.

Dr. Cunningham answered the "where do we go from here?" question by outlining the

reasons why appellant was "likely to have a nonviolent adjustment, in terms of no serious violence, to a life without parole sentence in TDCJ."

- Appellant's "nonviolent adjustment to 17 months jail pretrial";[6]

- "Appraisal of the correctional staff was not that [appellant] was going to be a predatory inmate that they needed to lock down";

- Appellant's history of employment: starting work at 16, and gaining "a pretty significant employment history for a kid that's arrested when he's 18";

- Appellant's continuing contact and relationship with family;

- The relatively low rate of major assaults committed by capital inmates serving a life term;

- The fact of serving a sentence of life without parole ("inmates facing life-without-parole sentences and long sentences have more to lose. This is where they're going to be for a very long time and potentially the rest of their lives, and because of that, they are particularly motivated not to make this experience any more horrible on themselves than it has to be.");

- The fact that he would be an inmate in the Texas prison system ("99.9 percent of inmates in Texas prisons in 2009 did not commit an assault resulting in injuries with more than first aid treatment");

- The option of appellant going to the Hodge Unit ("a unit for intellectually limited individuals" with a program designed to meet their needs "and help prevent them from being victimized by other inmates");

---

[6] Dr. Cunnningham said that he was aware of the Kenneth McDade incident but, "[i]t did not represent an assault."  He said that, in custody, "individuals may puff up. They may say things to try to build a persona. In other words, they may act bad, puff themselves up, talk trash, that kind of thing, to try to reduce the likelihood that they would be victimized, so you have to be careful about how to interpret that when you hear, you know, that there's threat behavior. That's one part of it. The other part of it is that you want to consider what's the source of this, because here's what happens. In jail, it's not uncommon for one inmate to try to implicate another inmate or raise an allegation against them to get some personal advantage for themselves."

- The option of protective custody ("because of the nature of his offense . . . for his safety so that other inmates didn't act out on him. Those conditions of confinement would look in many ways like administrative segregation.")

On cross-examination, Dr. Cunningham testified that he is always a defense expert because "the research is very clear that the overwhelming majority of capital offenders will never be violent in prison, that the rates of serious violence in prison are very low, that prisons are extraordinarily effective in minimizing the occurrence of serious violence."

## II.

### A.    Appellant's Oral Statement to Ranger Ray.

In his first two points of error, appellant argues that the admission of his oral statement to Ranger Ray violated both Article 38.22 and his Fifth Amendment rights.

Ranger Ray did not read appellant his statutory or *Miranda* rights, so the admissibility of his oral statement depends upon whether appellant was in custody–"a term of art that specifies circumstances that are thought generally to present a serious danger of coercion"[7]–when he gave it. We address these points together because "[o]ur construction of 'custody' for purposes of Article 38.22 is consistent with the meaning of 'custody' for purposes of *Miranda*."[8]

The Supreme Court recently reiterated the test for determining whether a person is in custody for purposes of *Miranda*: The first step "is to ascertain whether, in light of the

---

[7] *Howes v. Fields*, 132 S.Ct. 1181, 1189, ___ U.S. ___ (2012).

[8] *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

objective circumstances of the interrogation, a reasonable person would have felt he or she

was not at liberty to terminate the interrogation and leave."[9]  If the answer is "yes," then we

ask the "additional question whether the relevant environment presents the same inherently

coercive pressures as the type of station house questioning at issue in *Miranda*."[10]

In *Dowthitt*, we outlined four general situations which *may* constitute custody:

> (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and  (4) when there is probable cause to arrest [and the officers' knowledge of probable cause is communicated to the suspect] and law enforcement officers do not tell the suspect that he is free to leave.[11]

These situations *will* indicate custody if the circumstances would lead a reasonable person

to believe that he is under restraint to the degree associated with an arrest.[12]

We afford almost total deference to a trial judge's "custody" ruling when the questions

of historical fact turn on credibility or demeanor, and otherwise review the ruling *de novo*.[13]

We first examine all of the circumstances surrounding the interrogation–"the location

of the questioning, its duration, statements made during the interview, the presence or

absence of physical restraints during the questioning, and the release of the interviewee at

---

[9] *Fields*, 132 S.Ct. at 1189 (internal brackets, quotation marks, and citations omitted).

[10] *Id.* at 1190.

[11] *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

[12] *Id.*; *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983).

[13] *Herrera*, 241 S.W.3d at 526-27.

the end of the questioning"[14]–to determine whether a reasonable person in appellant's shoes would have felt he was not at liberty to end the interrogation and leave.[15]

Appellant agreed to talk to Ranger Ray, and the questioning took place in the ranger's patrol car parked in appellant's driveway. The interview was relatively short, just under one hour. Statements made to and questions asked of appellant ranged from friendly to accusatory. Appellant was not handcuffed or physically restrained, and he was released from the patrol car at the end of the interview. But, as appellant points out, before talking to Ranger Ray, he had been told that he would be taken to the county jail for further questions and the collection of his clothes. He told Ranger Ray, as the interview was ending,

Appellant:     Yeah, and they're taking me and Jess up to the police station.

Ray:           I don't know anything about that. Okay. Well, I tell you what, let's–let me–let me put just a little old ending on this tape. It's approximately 12:36 p.m., and, again, I'm–this is Sergeant Kenny Ray with the Texas Rangers out of Tyler, and I've been conducting a noncustodial interview with Blain Keith Milam at his residence in the northern part of Rusk County on County Road 2125. And you are free to go, my friend. Thank you for talking to me.

Appellant:     All right.

Under these circumstances, the various law-enforcement officers created a situation that could possibly lead a reasonable person to believe that his freedom of movement had been significantly, if temporarily, restricted. We therefore look to the additional question of "whether the relevant environment presents the same inherently coercive pressures as the

---

[14] *Fields*, 132 S.Ct. at 1189.

[15] *Id.*

type of station house questioning at issue in *Miranda*."[16] Or as stated in *Dowthitt*, we look to see if the circumstances would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.[17]

The Supreme Court, in *Howes v. Fields*, singled out communicated non-custodial status as the most important factor in determining that an inmate taken from his cell to a prison conference room for questioning about events that occurred outside the prison was not "in custody" for *Miranda*.[18]

That critical factor was present here. Ranger Ray consistently told appellant he was not in custody: "you're not under arrest"; "you don't have handcuffs on"; "we're just sitting and visiting"; "you know you're not under arrest. You're not in custody, okay"; "You can do whatever you want. You're not under arrest"; "We're through talking. Like I told you, you're sitting in my car. You don't have handcuffs on. You came over here voluntarily. We've just–we've just been sitting here talking. You're not–You're fixing to just get out and walk out. I mean, you're not under arrest. I'm telling you that right now."

Appellant knew that he was not free to leave the crime scene, but that fact would not strike any reasonable person, standing in appellant's shoes, as unusual or indicative of his "arrest" or that of anyone else. This was a major violent crime. Reasonable people are well

---

[16] *Id.*

[17] *Dowthitt*, 931 S.W.2d at 255; *see also Beheler*, 463 U.S. at 1125.

[18] *Fields*, 132 S.Ct. at 1193.

aware that, as a matter of course, evidence is collected from crime scenes and from the people present at crime scenes.[19] Further, appellant was told that his mother and brother would also be taken to the police station and then brought back.

Appellant:    Where's my mama?

Roy:          Her and Danny went up to the office. . . Same thing they're going to do with you and Jesseca.  We're going to carry you up there.

Appellant:    And bring us back?

Roy:          Yeah, we'll bring you right back.  We're not going to leave you stranded.

The State notes that the various officers can be heard on the dash-cam audio talking to each other and to appellant's brother, stating that no one was in custody.

Given all of the circumstances, we cannot say that the trial judge abused his discretion in finding that appellant was not in custody when he was interviewed by Ranger Ray.[20] Admission of the resulting oral statement–which contained no confession—did not violate Article 38.22 or the Fifth Amendment.  Points of error 1 and 2 are overruled.

**B.    Voir Dire Issues.**

**1.    Veniremember Trzeciak**

In his third point of error, appellant claims that the trial judge erred by granting the State's challenge for cause against veniremember Trzeciak in violation of *Witherspoon v.*

---

[19] *See Fields*, 132 S.Ct. at 1190 (the "temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody").

[20] *See id.*, 132 S.Ct. at 1193-94; *Dowthitt*, 931 S.W.2d at 255.

*Illinois*[21] and *Wainwright v. Witt*.[22]  In a capital prosecution, a prospective juror is not subject to a challenge for cause merely because he is opposed to or has "conscientious scruples" about the death penalty.[23]  Under *Witherspoon* and *Witt*, however, the trial judge may excuse prospective jurors based upon their views of the death penalty if these views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[24]

In determining whether the trial judge abused his discretion in ruling on a challenge for cause, we review the voir dire record in its entirety and ask whether the judge had a rational basis for his ruling.[25]  We grant the trial judge considerable deference, because he is in the best position to evaluate the prospective juror's demeanor and responses.[26]

In this case, the trial judge instructed the prospective jurors that they should not come

---

[21]  391 U.S. 510 (1968).

[22]  469 U.S. 412 (1985).

[23]  *Witherspoon*, 391 U.S. at 515.

[24]  *Adams v. Texas*, 448 U.S. 38, 45 (1980) (prospective jurors who can set aside their beliefs against capital punishment and honestly answer the special issues are not properly subject to challenge for cause); *Witt*, 469 U.S. at 424 (prospective jurors can be challenged for cause if their views about the death penalty would prevent or substantially impair the performance of their duties in accordance with their instructions and oath); *see also Segundo v. State*, 270 S.W.3d 79, 93 (Tex. Crim. App. 2008) (finding that, although the prospective juror never explicitly said that his personal views would "substantially impair" his ability to follow the law in answering special issues, it was nonetheless clear that he could not follow the law if it would lead to a death sentence).

[25]  *Granados v. State,* 85 S.W.3d 217, 230–31 (Tex. Crim. App. 2002).

[26]  *Davis v. State*, 313 S.W.3d 317, 343–44 (Tex. Crim. App. 2010).

forward at the end of the judge's voir dire to discuss their feelings about the death penalty, but instead should wait until they were called individually. Despite that request, venireman Trzeciak came forward and indicated that he did not think that there were any circumstances in which he could vote for the death penalty.

Trzeciak:    My thought on that is–I wanted to share with the Court that I don't believe there's a circumstance where I could condone or vote for the death penalty, based on my personal religious beliefs.

Judge:    All right.

Prosecutor:    Mr. Trzeciak, basically, you just wanted to come tell the Court that no matter what circumstances may be out there, you've already decided you could not consider the death penalty?

Trzeciak:    I cannot do that, yes.

Prosecutor:    Irrelevant of whatever that may be?

Trzeciak:    Irrelevant of whatever that may be.

Prosecutor:    You felt compelled to come tell us that now, rather than waiting to questioning, because you feel that strongly about it?

Trzeciak:    Well, I feel that strongly about it, and I didn't want to waste the Court's time in the future. I didn't know if that was going to be captured later on based upon the questionnaire that you put out, so I just wanted to let that be known now.

Defense:    . . . If the Court asks you or instructs you to render a true verdict, meaning will you answer those questions truthfully, the first one being in essence from listening to all the testimony, can you make a decision as to whether or not the defendant will be a danger to commit future acts of criminal violence, to be violent in the future? Could you answer that question truthfully, if so instructed?

Trzeciak:    Well, I'm going to try. I understand the question you're asking. If you're

asking. I would then go back to–in today's society, in my opinion and the opinion of my church, there's no justification for the death penalty. If I–rendering some sort of verdict in phase two, the potential exists for the death penalty; I could not vote that way.

***

Prosecutor:    Okay. But that based upon your religious feelings, that you would be very, very compromised to be in this sort of a situation?

Trzeciak:    That's correct.

***

Judge:    Sir, let me ask you this question. Can you return a verdict which assesses the death penalty in a case? You understand you're never going to write "death penalty."

Trzeciak:    Right.

Judge:    But can you, in good conscience–and I don't care what your answer is. I just need to know. Can you return a verdict which assesses a death penalty?

Trzeciak:    I could not.

The State challenged Mr. Trzeciak for cause. Appellant objected, arguing that Mr. Trzeciak said that he would answer the questions truthfully, despite his views on the death penalty. The judge overruled the objection.

Appellant now argues that the State did not go far enough to disqualify Mr. Trzeciak because he never explicitly said that he would consciously distort answers to the special issues to prevent imposition of the death penalty. But Mr. Trzeciak was clear that he could not follow the law in answering the special issues and would be unable to return a verdict leading to the death penalty. Although he stated that he would "answer questions truthfully," he also said that there was no set of circumstances under which the death penalty would be

justified, based on his religious beliefs. Furthermore, Mr. Trzeciak explicitly stated that he could not return a death-penalty verdict.

On this record we cannot find that trial judge abused his discretion in granting the State's challenge for cause. Mr. Trzeciak's answers concerning his inability to assess the death penalty under any circumstances were sufficient to support the trial judge's conclusion that he would be substantially impaired in his abilities as a juror.[27] Accordingly, we overrule appellant's third point of error.

## 2.    Veniremember Shaw

In his fourth point of error, appellant contends that the trial judge erred in overruling his *Batson*[28] challenge to the State's peremptory strike of black veniremember Shaw. A defendant objecting under *Batson* must make a *prima facie* showing of racial discrimination in the State's exercise of its peremptory challenges.[29] If the defendant makes a *prima facie* showing of discriminatory motives, the State then has the burden to produce a race-neutral explanation.[30] If the State articulates a race-neutral explanation, the burden remains with the defendant to show that the State's proffered reasons are mere pretexts for discrimination.[31]

---

[27] *See Segundo*, 270 S.W.3d at 93.

[28] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[29] *Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); *Mathis v. State*, 67 S.W.3d 918, 924 (Tex. Crim. App. 2002).

[30] *Herron*, 86 S.W.3d at 630.

[31] *Id.*

The trial judge must then decide whether the defendant has proven purposeful discrimination.[32] Because the trial judge's decision often turns largely on an evaluation of credibility, we give the judge's ruling great deference and will not disturb it unless it is clearly erroneous.[33]

After the defense objected under *Batson* to the State's use of a peremptory challenge against veniremember Shaw, the prosecutor offered a race-neutral explanation for her strike. The prosecutor explained that she struck Ms. Shaw because she indicated, at least eight times on her questionnaire, that she was personally against the death penalty.[34]

Appellant argued in response that the State spent nearly two hours questioning Shaw during voir dire, which was the longest amount of time spent with any prospective juror besides veniremember Lucas, also a black juror. Appellant added that the prosecutor twice referred to Ms. Shaw outside of the courtroom as an "angry black female." The prosecutor admitted to using the term after questioning Ms. Shaw, but stated that neither that remark nor Shaw's race had anything to do with the strike. Regarding the two hours of questioning, the

---

[32] *Id.*

[33] *Id.*

[34] For example, in one question, which asked her to describe her personal feelings about the death penalty, Ms. Shaw responded, "Following capital murder I feel that a person should get life imprisonment without the possibility of parole. There have been too many false convictions and people put to death that were innocent." When asked to circle which of six statements best represented her feelings regarding the death penalty, Ms. Shaw circled (E), "I believe we should abolish the death penalty and I will have a difficult time voting to impose it, regardless of the facts of the case." On a scale of 0 to 10, 10 being always give the death penalty and 0 being never, Ms. Shaw circled 0.

prosecutor explained that she had hoped to be able to challenge Ms. Shaw for cause because of her views about the death penalty in her questionnaire answers.

Because the State offered race-neutral reasons for its strike and appellant failed to rebut those reasons, we hold that the trial judge did not clearly err in denying appellant's *Batson* challenge.[35]  Appellant's fourth point of error is overruled.

## C.    The Admission of Autopsy Photographs.

In his fifth point of error, appellant argues that the trial judge erred by admitting highly prejudicial and irrelevant autopsy photographs.  He specifically complains that the admission of State's Exhibits 92-112 violated Texas Rule of Evidence 403, as well as the due-course-of-law and due-process clauses of the Texas and U.S. Constitutions.  Because his only argument deals with Rule 403, that is the only basis for exclusion that we will address.

Under Rule 403, if the use of a photograph is helpful and "relevant, legitimate, and logical to the testimony that accompanies it," the trial judge may exclude it only if its emotional and prejudicial aspects substantially outweigh the helpful aspects.[36] In a Rule 403 analysis of autopsy photos, factors such as the "number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, whether the body is naked or clothed" are appropriate for consideration.[37]  We

---

[35]  *See Herron*, 86 S.W.3d at 630.

[36]  *Erazo v. State*, 144 S.W.3d 487, 491-92 (Tex. Crim. App. 2004).

[37]  *Long v. State,* 823 S.W.2d 259, 272 (Tex. Crim. App. 1991).

review the trial judge's Rule 403 ruling for an abuse of discretion.[38]

Appellant argues that these autopsy photographs had no probative value concerning any disputed fact because he did not contest the manner and cause of Amora's injuries or death. Although he did not expressly contest the manner and cause of Amora's death, appellant did hold the State to its burden of proving its case beyond a reasonable doubt by consistently challenging the rough-shod manner of the investigation and handling of physical evidence. He also challenged the assertion that most of the injuries were inflicted before Amora's death. Moreover, the State had the burden of proving that appellant intentionally or knowingly murdered the infant, "and the photographic representation of the injuries tends to establish this element in a way which testimony by witnesses could not as accurately portray."[39]

The autopsy photographs admitted–only twenty of the some 300 autopsy photos–were personally selected by the medical examiner, Dr. Keith Pinckard, to best illustrate his testimony.[40] The color photographs were displayed on a projector. Multiple photographs were necessary because multiple injuries were inflicted. Dr. Pinckard testified that, even after the autopsy, he could not tell exactly which injury caused death. Rather

---

[38] *State v. Mechler*, 153 S.W.3d 435, 438–40 (Tex. Crim. App. 2005).

[39] *Lanham v. State,* 474 S.W.2d 197, 199 (Tex. Crim. App. 1971) (admission of nine color photographs of battered child, taken shortly after she was placed in police custody was not an abuse of discretion).

[40] Dr. Pinckard actually picked out twenty-one photos, but the trial judge sustained an objection to State's Exhibit 113 "because of the mutilation shown as a result of the autopsy."

there were many injuries present, and there was also, as I indicated, the pretty good possibility that strangulation was also involved. So we have the possibility for strangulation. We have a head injury that could easily cause death. We have a liver injury that might cause death, although there wasn't a whole lot of bleeding, so maybe not here. And then, of course, we have a number of injuries to–just the bruising itself was so extensive on the body, you can actually experience effects just from the amount of bleeding that occurs into the tissue. So rather than anything specific, we certified the cause of death as homicidal violence, because it was obviously inflicted, including multiple blunt force injuries and possible strangulations.

The autopsy photographs were probative of the fact that this was a cruel and deliberate killing–with multiple injuries inflicted ante-mortem, rather than post-mortem. These photographs, which simply showed the number and type of injuries Amora suffered, could add little to improperly inflame or prejudice the jury. The trial judge did not abuse his discretion in admitting the autopsy photographs.[41] We overrule appellant's fifth point of error.

**D.    Crime Lab Accreditation–Tex. Code Crim. Proc. art. 38.35**.

In his sixth point of error, appellant argues that the trial judge abused his discretion in admitting the testimony of Dr. Robert Williams, a forensic odontologist, in violation of Article 38.35–which makes the admissibility of some forensic evidence contingent on whether the analysis of the evidence was conducted at an accredited laboratory.

Article 38.35(d) provides, in relevant part, that

---

[41] *See Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) ("[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence. A trial court does not err merely because it admits into evidence photographs which are gruesome").

a forensic analysis of physical evidence under this article and expert testimony relating to the evidence are not admissible in a criminal action if, at the time of the analysis, the crime laboratory conducting the analysis was not accredited by the director under Section 411.0205, Government Code.[42]

Subsection (d) was added to Article 38.35 in 2003, in response to problems with the DNA evidence testing and examination operations in the Houston Police Department Crime Lab.[43]

Before Dr. Williams testified, a hearing was held, outside the jury's presence, on appellant's Article 38.35 challenge. Appellant did not dispute that Dr. Williams is the chief forensic odontologist for SWIFS[44] or that SWIFS is an accredited crime lab. His objection was two-fold. First, appellant alleged that Dr. Williams's work in this case was done as part of his private dental practice, rather than for SWIFS. Second, SWIFS, although accredited through ASCLD/LAB-L[45] for various scientific disciplines, was not certified for odontology. The trial judge overruled appellant's objections, but gave him a running objection to all of Dr. Williams's testimony. We review that ruling for an abuse of discretion.[46]

First, the record supports the trial judge's implicit finding that Dr. Williams conducted

---

[42] Tex. Code Crim. Proc. art. 38.35(d)(1).

[43] House Research Organization, Bill Analysis for House Criminal Jurisprudence Committee, HB 2703, 78th Leg., R.S. (2003).

[44] SWIFS is the acronym for "Southwestern Institute of Forensic Sciences."

[45] ASCLD/LAB is the acronym for "American Society of Crime Laboratory Directors-Laboratory Accreditation Board Legacy." http://www.txdps.state.tx.us/CrimeLaboratory/documents/List_Texas_LabsAccredited.pdf (last visited May 10, 2012).

[46] *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

this analysis for SWIFS. The medical examiner testified that, because it was "incredibly obvious" that the baby was covered in human bite marks, he called in Dr. Williams "so that he would he able to take his own photographs." Dr. Williams testified that he is an independent contractor for SWIFS. He said that he was called to the autopsy suite at SWIFS by Dr. Pinckard, the medical examiner. When he gets such a call, he winds up the work in his own practice "immediately" and then heads for the Medical Examiner's Office. Dr. Williams explained that he works as an independent contractor for a number of labs because most medical examiner offices "do not have the budget to be able to pay someone a full-time salary[.]"

Second, SWIFS, according to Defense Exhibit 9 ("Current List of DPS Accredited Labs from Texas, 8/6/2009"), was one of eight accredited labs, and in fact the most extensively "accredited" of the eight.[47] Article 38.35 does not specify that the crime laboratory must be certified in the exact discipline that is the subject of the testimony.[48] And

---

[47] SWIFS, as of that date, was the only one of the eight certified in at least five of the six disciplines subject to DPS accreditation. No lab was then certified in "Questioned Documents."

[48] Article 38.35 does not purport to cover the admission of all forensic evidence–or even most of it. Many disciplines and procedures are excluded from the definition of forensic analysis or otherwise exempted from accreditation requirements "based on their nature" or based on the determination of the Director "that no accreditation is appropriate or available." TEX. CODE CRIM. PROC. art. 38.35; TEX. GOV'T CODE § 411.0205; 37 TEX. ADMIN. CODE § 28.145-147. Among these are: latent print examination; breath alcohol analysis; digital evidence; forensic pathology, not including toxicology or other laboratory associated with the office of a medical examiner; forensic anthropology, entomology, or botany; forensic photography; polygraph examination; voice analysis; non-criminal testing; viral DNA testing. For the full list see http://www.txdps.state.tx.us/CrimeLaboratory/LabAccreditation.htm (last visited May 10, 2012).

odontology is not one of the disciplines for which accreditation is available.[49] Nevertheless,

odontology is a species of impression evidence, and Chapter 37, Section 28.145(d) of the

Texas Administrative Code provides that

> the subdiscipline of impression evidence, including footwear, tiretrack, and similar impression evidence, may be administratively assigned by the laboratory to its trace evidence section, firearms section, or questioned document section. The director deems impression evidence to be a subdiscipline of several disciplines under this subchapter, including trace evidence, firearms/toolmark, or questioned documents.

SWIFS was, as the prosecutor pointed out to the trial judge, accredited in the trace-evidence

and firearms/toolmark disciplines. Given this record, we conclude that the trial judge did not

abuse his discretion in overruling appellant's objection to Dr. Williams's testimony.[50] We

overrule point of error six.

## E.     Future Dangerousness.

In his seventh point of error, appellant argues that the evidence is legally insufficient

to support the jury's affirmative answer to the "future-dangerousness" special issue.

A jury may consider a variety of factors when determining whether a defendant will

pose a continuing threat to society.[51] The facts of the offense alone may suffice to support

---

[49] 37 TEX. ADMIN. CODE § 28.145 describes the disciplines and subdisciplines that involve forensic analysis for use in a criminal proceeding for which accreditation is available from a recognized accrediting body. Among those disciplines are (1) controlled substances; (2) toxicology; (3) biology; (4) firearms/toolmark; (5) questioned documents; (6) trace evidence; or (7) other discipline if approved by a recognized accrediting body and the director.

[50] *See Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006).

[51] *Freeman v. State*, 340 S.W.3d 717 (Tex. Crim. App. 2011); *Wardrip v. State*, 56 S.W.3d 588, 594 & n. 7 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim.

the jury's finding of future dangerousness.[52]   We view the evidence in the light most favorable to the jury's finding and determine whether any rational trier of fact could have found, beyond a reasonable doubt, that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.[53]

The circumstances of Amora's murder are, by themselves, sufficient to sustain the jury's finding of future dangerousness.  Appellant savagely beat, bit, strangled, and sexually mutilated the thirteen-month old daughter of his girlfriend–either alone or with her.  Dr. Pinckard testified that this was "not a quick event" because of the number of injuries that are "clearly antemortem."  He agreed that "anyone who would inflict these injuries on Amora would have had to have known that death was reasonably certain to be the result."  Dr. Pinckard testified that he had never–in his decades of experience–seen a  more severe case of child abuse.   Evidence that a murder was committed with deliberation and forethought may be sufficient for a finding of future dangerousness.[54]

---

App. 1987) The *Keeton* factors are: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the crime; (7) psychiatric evidence; and (8) character evidence.

[52] *Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim. App. 2008); *Sonnier v. State*, 913 S.W.2d 511, 517 (Tex. Crim. App. 1995); *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986).

[53] *Holberg v. State*, 38 S.W.3d 137, 139 (Tex. Crim. App. 2000).

[54] *Id.*; *see also Sonnier*, 913 S.W.2d at 517.

Evidence of a defendant's prior criminal record may also serve as the basis for a finding of future dangerousness, and this jury was presented with evidence of appellant's prior solicitation of aggravated sexual assault of his eleven-year-old neighbor.[55]

Appellant asserts that the future-dangerousness special issue requires the jury to determine whether a capital defendant would be a continuing threat to prison society. And under this "future danger test of *Berry* [*v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007]," the "State has failed to prove that [appellant], unless executed, would ever pose the threat of criminal violence he posed in this case–danger to a child." That is, if appellant were allowed to live, he would spend the rest of his life in prison and therefore never have the opportunity to hurt a child again. Appellant acknowledges that in *Estrada v. State* and *Coble v. State*, we interpreted the future-dangerousness special issue to ask whether a defendant would be a continuing threat "whether in or out of prison."[56] Appellant asserts that the *Coble-Estrada* construction of the future-danger test permits consideration of hypothetical predictions and is inconsistent with the Supreme Court's holding in *Jurek v. Texas*,[57] which interpreted the Texas statute as "requiring a literal prediction of future criminal conduct made to further the goal of incapacitation."[58] He argues, "Keeping faith with *Jurek*, this Court should here apply

---

[55] *Wilson v. State*, 7 S.W.3d 136, 142 (Tex. Crim. App. 1999).

[56] *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010); *Coble v. State,* 330 S.W.3d 253, 268 (Tex. Crim. App. 2010).

[57] 428 U.S. 262 (1976).

[58] Appellant's Brief at 52.

the future danger test of *Berry* which considers the restraints inherent in the alternative sentence to death."[59]  We have rejected this argument.[60]

Further, the State's case for future dangerousness was not "child-specific."  The jury heard about appellant's escalating pattern of violence.  He settled his scores with adults with violence–he "caught a guy in his apartment, and he commenced to whupping his ass."  He "took care of" a guy he found with his niece.  He fought with his brother because he was tired of arguing about cigarette smoke: "I was tired of arguing with him, and I wasn't going to argue with him, so I hit him in the mouth." Deputy Clark–who investigated the fight–testified that appellant's mother asked him, "What can be done about Blaine?"

> She said that his temper had progressed from the years. She said that he had began with becoming upset and showing anger through his emotions, and she said he went from that to verbal abuse. She said over the years he went to physical abuse, and she said that it's been ongoing and uncontrollable. She said this is just getting to the point where she couldn't control it, and now [his] brother is getting to where he can't control it. And she asked me what can be done about his—about his actions . . . .

And this case is distinguishable from *Berry* for yet another reason: The jury heard that appellant, while he was in Rusk County jail, told another inmate of his plan to escape.  "He said his brother was going to have a bomb threat put on the jail, so that everybody in K Tank would get let out."  He was then going to escape to Mexico.  Appellant ended up threatening

---

[59] *Id.*

[60] *Freeman*, 340 S.W.3d at 726-27 (rejecting a claim that the future-dangerousness special issue requires the jury to determine whether a capital defendant sentenced to life imprisonment would be a continuing threat to prison society).

this inmate after they got in to an argument, saying "if I kept messing with him, I would wake up with a pencil in my side." Because he feared retaliation, the inmate never reported the threat until appellant was moved from K Tank. Appellant's pattern of violence did not diminish, even in jail.

Having viewed all of the evidence in the light most favorable to the jury's finding, we conclude that a rational jury could have found, beyond a reasonable doubt, a probability that appellant would pose a continuing threat to society.[61] Point of error seven is overruled.

## F.    Racial Prejudice.

In his eighth point of error, appellant argues that the trial judge erred, in the punishment phase, in admitting evidence of appellant's father's racial prejudice. Appellant's friend, Chris Lay, testified about the end of appellant's schooling in the fourth grade.

A.    Educationally [he was slow], because, I mean, he got pulled out of school in the fourth grade because people picking on him, you know. His dad got tired of it and said he didn't want him in school no more, if everybody was going to mess with him like that.

On cross-examination, the prosecutor revisited appellant's exit from school:

Q.    And you've–you visited with Missy, our investigator, over the weekend, right? . . . And you told her that part of the reason why he got pulled out of school was because his dad was upset because his principal was black.

A.    Well, he was upset because–yeah, that, too.

The trial judge overruled appellant's Rule 403 objection. Outside the presence of the jury, the prosecutor explained that she presented the evidence to refute the false impression that

---

[61] *See Coble*, 330 S.W.3d at 268-69; *Estrada*, 313 S.W.3d at 281.

Mr. Lay had given to the jury.[62]  Defense counsel pointed out that the jury already knew, from previous testimony, that appellant was pulled from school after the paddling and that this was

> nothing more than a direct appeal to that jury for unfair prejudice against him through his father. It's not like this man had any belief like this. We're talking about a child who was in the fourth grade. And they want to bring in the fact the father pulled him out because the principal was black? And I believe what the witness testified to is he was pulled out because he was paddled, which was not a false impression, because that's exactly what the jury was told. It just–you noted it for the record. You've done–you've made your ruling, and I've had my say. Fine. Move again for a mistrial.

The trial judge overruled the motion for mistrial, but gave the jury the following limiting instruction.

> Ladies and gentlemen, the Court overlooked this prior to beginning the testimony of this witness. I want to instruct you concerning some prior testimony this morning. You're not to hold any alleged racial statements allegedly made by this defendant's father against this defendant, or infer that this statement or these statements are or is the belief or view of this defendant, and any racial content of any alleged statement is not to be inferred upon this defendant.

Appellant now argues that "it was irrelevant that the principal who paddled Milam, causing his father to take him out of school, was African-American."[63]  The State counters that the evidence was relevant to impeach Mr. Lay and "to counter the assertion that the sole

---

[62]  The prosecutor explained that appellant's father pulled appellant out of school because "he had been spanked by the principal, and his dad was upset about the principal spanking him; and he was black."

[63] Appellant's Brief at 58.

reason Appellant was removed from school was because he was unfairly picked on."[64]

A trial judge's relevancy rulings will not be disturbed absent an abuse of discretion.[65] Appellant relies on *Bell v. State*, in which the Beaumont Court of Appeals held that it was reversible error for the State to elicit testimony, at the punishment stage, from the defendant's mother about racially charged comments she overheard after her son was found guilty.

> The fact that Ms. Bell may have heard the jury or the prosecutor referred to as "prejudiced" or "redneck," or that she heard someone comment that the verdict was unfair because of the fact that the appellant was Black and the jury was entirely white, without having first connected the source of said comments to appellant's family or friends, was simply irrelevant as to any issue regarding appellant.[66]

One critical difference between *Bell* and this case is that in *Bell*, it was the jury itself that was accused of being racist.[67] Further, in this case, the trial judge instructed the jury not to hold appellant's father's possible racism against appellant. There is no indication that the jury disregarded the trial judge's instruction, and we must presume that it followed those instructions.[68]  Point of error eight is overruled.

## G.    Examining Experts: *Lagrone.*

Appellant's ninth, tenth, and eleventh points of error address the trial judge's ruling,

---

[64] State's Brief at 93.

[65] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

[66] *Bell v. State*, 948 S.W.2d 535, 540 (Tex.App.–Beaumont 1997, no pet.).

[67] *Id.* at 540-41.

[68] *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (jury presumed to following limiting instruction).

made at appellant's request, that the experts interviewing appellant be prohibited from asking him about the facts of Amora's murder.  Specifically, appellant argues that the State's questioning of both the defense and State's experts about that prohibition violated appellant's right to remain silent (point nine), constituted prosecutorial misconduct (point ten), and deliberately deceived the jury (point eleven).

**1.**     ***Soria / Lagrone / Chamberlain***

In *Soria v. State*,[69] we recognized that a defendant may "waive" his Fifth Amendment rights to a limited extent by presenting psychiatric testimony.   We held that

> when the defendant initiates a psychiatric examination and based thereon presents psychiatric testimony on the issue of future dangerousness, the trial court may compel an examination of appellant by an expert of the State's or court's choosing and the State may present rebuttal testimony of that expert based upon his examination of the defendant; provided, however, that the rebuttal testimony is limited to the issues raised by the defense expert.[70]

In *Lagrone v. State*, we expanded the scope of the rule to allow trial judges to order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, or *plans to introduce,* its own future-dangerousness expert testimony based upon a psychiatric examination.[71] In *Chamberlain v. State*, we held the rule applicable even if the appellant introduces the evidence only in rebuttal.[72]  We noted that

---

[69] 933 S.W.2d 46 (Tex. Crim. App. 1996).

[70] *Id.* at 58–59 (footnotes omitted).

[71] 942 S.W.2d 602, 611 (Tex. Crim. App. 1997).

[72] *Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999).

*Soria* and *Lagrone* are governed by the principle that if a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts. The focus is the defendant's choice to break his silence.[73]

With this background, we turn to the relevant facts.

## 2.    Relevant Facts

Before trial, the State filed a motion for a psychological evaluation of appellant to rebut appellant's psychological testimony.  The trial judge conducted a pretrial hearing on the motion during which the defense asked that the State's expert be prohibited from asking appellant questions about the facts of the crime.  The defense said that it had not let its own experts talk to appellant about the crime, and that none of them "have used any information that they gained through him concerning the offense in forming any opinions."  The defense opposed inquiry into the facts on a number of grounds, including the Fifth Amendment right to remain silent.  The State objected, arguing that once a defendant waives his right to remain silent by talking to experts, he cannot dictate the questions that he is asked.

Relying on the language contained in *Chamberlain*, that "the essential principles at

---

[73] *Id*. at 234.  Since *Chamberlain* we have held, in unpublished opinions, that the *Soria/Lagrone* line of cases may be extended to psychological examinations of the defendant to develop mitigating evidence, or determine mental retardation.  *Ward v. State*, No. AP 74695, 2007 WL 1492080 (Tex. Crim. App. May 23, 2007); *Lizcano v. State*, No. AP-75879, 2010 WL 1817772, *8 (Tex. Crim. App. May 5, 2010) ("The precise nature of the psychological testimony to be presented is immaterial; that it is being presented by the defendant is enough to trigger the rule.").

work in *Lagrone* and *Soria* are waiver and parity,"[74] the trial judge agreed to limit examination to exclude any discussion of the facts of the crime by both parties.

> All right. The Court has reviewed the cases submitted to it, and the Court–and primarily based upon language contained in *Chamberlain*, I am going to limit the interview to exclude the offense, with the understanding that defendant's experts will be precluded from offering any . . . findings, conclusions, or opinions based upon any interview or conversations of the defendant, by the expert of the defendant, concerning the offense itself. And, of course, this does not preclude any opinions, findings, or conclusions obtained from sources other than the defendant. Anything further?

At trial, Dr. Cunningham, the defense expert, testified that appellant's mental deficiency is sufficiently severe for him to meet the diagnostic criteria for mental retardation. He also testified that appellant had psychotic symptoms related to his methamphetamine abuse, and that "given the extent of methamphetamine that he was using prior to the crime, it's very likely that he may have been delusional. It may have induced a psychotic state that looked similar to schizophrenia. He may have actually had some hallucinations."

On cross-examination by the prosecutor, the following exchange took place:

Q.    . . . When you interviewed the defendant in those 9 hours that you spent with him, you did not ask him one thing about the capital murder for which this jury has convicted him, did you?

A.    That's correct.

Q.    Why?

A.    Well, primarily because I was instructed by Counsel not to go into the circumstances, the events of the offense itself.

---

[74] 998 S.W.2d at 234.

Q.    Really?

A.    Yes, ma'am.

Defense counsel then renewed the Fifth Amendment objection he had made at the pretrial hearing. The State responded, "He didn't remain silent. He waived his right to remain silent, and in talking to the expert, he–there is no such thing as a partial waiver. . . . I have every right to ask him about that, because it's–once he waives, he waives." The trial judge overruled the objection, but granted appellant's running objection.

The prosecutor resumed cross-examination and later asked,

Q.    Okay. Well, I'll come back to that. But you do talk to capital murderers about the facts of the capital murder they've been convicted of.

A.    Infrequently. Most of the time I do not. Most of the time defense counsels do not authorize a discussion about the capital offense. The defendant retains a Fifth Amendment right to not incriminate himself, even for an evaluation that's being performed for sentencing purposes . . . .

In rebuttal, the State called Dr. Tim Proctor, and questioned him as follows:

Q.    Okay. Now, you've told us that you spent a significant amount of time interviewing the defendant?

A.    Yes.

Q.    Were you permitted to talk to this defendant, Blaine Milam, about the facts of the capital murder case for which he has been convicted?

The trial judge overruled appellant's running objection.

Q.    Dr. Proctor, were you able to speak with the defendant about the facts of the capital murder case for which he was convicted by this jury?

A.    No.

Later, the prosecutor asked Dr. Proctor about Dr. Cunningham's opinion that appellant might have been delusional.

Q.    In your field as a psychologist, as a forensic psychologist, is it appropriate to diagnose someone or to opine that someone is psychotic or delusional without having talked to them?

A.    Well, I think the best way for me to answer that is to tell you what I would do and what I would teach my students. And I believe that to make an assertion about what someone's mental state was like at the time of some offense, you have to have talked to them about that to have a meaningful opinion about that. And without doing that, I don't know how you can know, especially in the absence of some other piece of evidence where the person at issue has given a recitation of what happened.

## 3.    Points of Error Nine, Ten, and Eleven

Appellant argues in his ninth point of error that the trial judge erred in allowing the above questioning in violation of "the spirit, if not the letter" of the trial judge's previous order and of appellant's Fifth Amendment right to remain silent.  In his tenth point of error, appellant argues that the State's conduct–in exposing the fact that the experts did not talk to appellant about the facts of the crime–constituted prosecutorial misconduct.  That misconduct (1) violated his Fifth Amendment right to be free of harm for exercising his right to remain silent about the facts of his case,[75] and (2) unfairly left "the jury with the impression that Appellant, on advice of counsel, was attempting to hide important information that bore on the issue."[76]   In his eleventh point of error, appellant asserts that leaving this impression–when it was actually the trial judge's ruling to prohibit the experts from inquiring

---

[75] Appellant's Brief at 63.

[76] Appellant's Brief at 63-64.

about the facts of the case–amounted to *Napue v. Illinois*[77] or "false testimony" error because it discredited appellant and "undermined his case for mental retardation."[78]

First, the trial judge did not err.  This line of questioning did not violate his pretrial order:  That order limited only the questioning of appellant, not the questioning of testifying experts. And the questioning did not violate appellant's Fifth Amendment right to remain silent.  Appellant broke his silence to speak to his own psychiatric expert and introduced testimony based on that interview, so he constructively took the stand, and waived the Fifth Amendment "in the same manner as would his election to testify at trial."[79] The State was then entitled to offer rebuttal testimony limited to the issues raised by the defense expert. It was permissible for the State to test Dr. Cunningham's opinions by questioning him (and Dr. Proctor) about how Dr. Cunningham arrived at those opinions.[80]  Appellant may not testify through a defense expert and then use the Fifth Amendment as a shield against cross-examination of that expert on disputed issues.

Second, there was no misconduct.  The State did not leave a false impression "that

---

[77] 360 U.S. 264 (1959).

[78] Appellant's Brief at 67.

[79] *Chamberlain*, 998 S.W.2d at 234; *Lagrone*, 942 S.W.2d 602; *Soria*, 933 S.W.2d 46.

[80] *Lagrone*, 942 S.W.2d at 611. *See generally*, *Renteria v. State*, No. AP-74829, 2011 WL 1734067, at *42 (Tex. Crim. App. May 4, 2011) (not designated for publication) (cross-examination of Dr. Cunningham as to why he did not question Renteria about the offense did not exceed the scope of proper cross-examination; defense counsel called Cunningham to testify that Renteria would not be a future danger in prison, so it was permissible for the State to test Cunningham's credibility by questioning him as to how he arrived at that conclusion).

Milam refused to speak about the facts of the offense, rather than it being the trial court's decision that the experts not inquire about the facts of the offense."[81]  The trial judge limited inquiry by the experts into the facts of the crime solely at appellant's behest.  Appellant chose not to discuss the crime facts with his expert,  and the trial judge entered an order limiting these expert examinations only because of appellant's request.

Third, there was no false testimony.  Dr. Cunningham testified he was instructed by counsel not to inquire into the facts of the case, and Dr. Proctor testified that he was not able to speak with the defendant about the facts of the case.[82]  These were true assertions.  They do not conflict with appellant's request to the trial judge and the trial judge's order based on that request.[83]  Appellant's points of error nine through eleven are overruled.

## H.    State's Punishment-Stage Closing Argument.

In his twelfth point of error, appellant argues that two portions of the State's closing argument violated his Eighth Amendment right to have the jury consider and give effect to his mitigating evidence, and so denied him his right to a fair trial and reliable sentencing.

There are four proper areas of jury argument: (1) summation of the evidence presented at trial; (2) reasonable deduction drawn from that evidence; (3) answer to the opposing

---

[81] Appellant's Brief at 66.

[82] State's Brief at 104.

[83] *See Renteria*, 2011 WL 1734067, at *42.

counsel's argument; or (4) a plea for law enforcement.[84]    Any appellate claim that a

prosecution argument strayed outside the bounds of these categories is forfeited if there was

no contemporaneous trial objection.[85]    If there was a contemporaneous trial objection to

improper jury argument, such argument does not result in reversal "unless, in light of the

record as a whole, the argument is extreme or manifestly improper, violative of a mandatory

statute, or injects new facts harmful to the accused into the trial proceeding."[86]

Appellant complains about two arguments.  First, appellant asserts that the prosecutor

misstated the law on mitigation, misstated the special issue, and prevented the jury from

giving effect to appellant's mitigating evidence, when she argued–over a running

objection–that only evidence of appellant's being abused as a child could justify a life

sentence.

> Mitigating evidence is that which lessens a person's moral blameworthiness
> for what he's done. And yes, you have heard evidence from his background
> that is unfortunate. You have heard things that I can agree was not the perfect
> life growing up; however, the problem is, the fundamental problem is that the
> one type of mitigating evidence that could explain this, that I would suggest
> to you might be sufficient to explain this act and this conduct and this crime,
> is not here. If there was evidence before you that this defendant had been
> horribly abused as a child, horribly abused as a child, I could stand before you
> ***

---

[84] *Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000); *Brown v. State*, 692 S.W.2d 497, 502 (Tex. Crim. App. 1985).

[85] *Threadgill v. State*, 146 S.W.3d 654 (Tex. Crim. App. 2004); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim App. 1996).

[86] *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000);  *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex. Crim. App. 1980) (panel op.).

[objection overruled]

Thank you, Your Honor. If he had been somehow horribly abused as a child, bitten, beaten, violated, perhaps that would be mitigating evidence that would lessen his moral blameworthiness sufficiently to warrant life. Folks, that's not here. As much–as much as the Milam family did not do right over the years, they did not abuse their kids, and nobody else did either. That's not here. That's the bottom line, and I would suggest to you that really is the only kind of mitigating evidence that truly can explain why we're here and truly lessen moral blameworthiness for this. I would ask you, when you're looking at the mitigating evidence, to go back to that life-altering moment when you first saw and you first realized what he did to Amora, everything he did to Amora, and ask yourself what could possibly mitigate that? That is the bottom line where the fourth question is concerned. The answer to the fourth question is "No."

The prosecutor did not misstate the law on mitigation or the mitigation special issue.

Article 37.071(f) provides that the jury "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[87]  Nor did the prosecutor prevent the jury from giving effect to appellant's mitigating evidence.  The argument was a fair rebuttal to defense counsel's argument that appellant

is the reason for this system. He's the reason why we don't say, 'Guilty, death penalty'. . . . How many mitigating factors are there? In fact, I think I have like three pages written down here of factors through this kid's life that could be mitigating and need to be considered . . . . That's why we don't let the mob mentality decide these cases, because everything that you've heard mitigates against giving this boy death.

For these reasons, we find nothing in the prosecutor's remarks to reflect that she was asking the jury to forgo its duty and automatically answer the special issues in such a way that

---

[87] TEX. CODE CRIM. PROC. art. 37.071(f).

appellant would receive the death penalty.[88] The trial judge did not err in overruling appellant's objection.

Second, appellant complains that the prosecutor violated his right to a reliable sentencing determination by falsely arguing that the jury had no choice but to assess death: "Sometimes the death penalty is society's last line of self-defense. . . . He has earned it, and you know it's the only choice." Appellant did not contemporaneously object to this closing argument, and therefore he has forfeited any complaint on appeal about it.[89] We overrule appellant's twelfth point of error.

## I.    Constitutional Challenges to the Texas Death Penalty Statute.

Appellant's remaining points of error are constitutional challenges to the Texas death-penalty statute. Appellant candidly acknowledges that all of these challenges have previously been rejected by this Court. Appellant invites us to review our prior positions. We decline to do so and briefly answer each claim by citing the controlling authority.

In his thirteenth point, appellant challenges the "10–12" rule, arguing that it violates his rights under the Eighth and Fourteenth Amendments because it leaves jurors in the dark about the fact that their failure to unanimously agree on an answer to either special issue results in a life sentence. This Court has rejected these challenges.[90]

---

[88] *Freeman v. State*, 340 S.W.3d 717, 730 (Tex. Crim. App. 2011).

[89] *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

[90] *Estrada v. State*, 313 S.W.3d 274, 306 (Tex. Crim. App. 2010); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App.

In his fourteenth point, appellant claims that the trial judge committed reversible error by charging the jurors that they had discretion to decide whether a particular circumstance was mitigating.  Consistent with Article 37.071, §(2)(f)(4), the trial judge charged the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the

defendant's moral blameworthiness." Appellant argues that the statute violates the Eighth Amendment, "which permits jurors no such discretion."  We have rejected this claim.[91]

In his fifteenth point, appellant argues that the trial judge's failure to define "probability," "criminal acts of violence," or "continuing threat to society" violated the constitutional requirement that each statutory aggravating circumstance genuinely narrows the class of persons eligible for the death penalty.  We have repeatedly held that the trial judge need not define such terms because we presume that the jury understands them.[92]

In his sixteenth point, appellant argues that the State's unfettered, standardless, and unreviewable discretion to seek the death penalty violates his rights under the Equal Protection and Due Process Clauses and results in cruel and unusual punishment.  We have

---

2007); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004).

[91] *Estrada*, 313 S.W.3d at 306; *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004).

[92] *Russeau v. State*, 291 S.W.3d 426, 434-35 (Tex. Crim. App. 2009); *Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007); *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007).

repeatedly rejected these contentions.[93]

In his seventeenth point, appellant argues that the Texas death-penalty scheme violates due process because the mitigation special issue fails to require the State to prove the absence of mitigating circumstances beyond a reasonable doubt, contrary to the *Apprendi* line of cases. And in his eighteenth point, he argues that the scheme violates due course of law and results in cruel and unusual punishment in violation of the Texas Constitution because of the "impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty." We have rejected these claims.[94]

In points nineteen and twenty, appellant contends that the cumulative effect of these constitutional and statutory infringements violates the state and federal constitutions. Having found no such violations, we hold that these claims are without merit.[95]

Having overruled appellant's points of error, we affirm his conviction and sentence.

Delivered: May 23, 2012
Do Not Publish

---

[93] *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); *Hankins v. State*, 132 S.W.3d 380, 387 (Tex. Crim. App. 2004); *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004); *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995).

[94] *Smith v. State*, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); *Fuller v. State,* 253 S.W.3d 220, 234 (Tex. Crim. App. 2008); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004).

[95] *See Turner v. State*, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Chamberlain*, 998 S.W.2d at 238 (non-errors cannot cumulatively cause error).